IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Michael Hanson,                         :

      Plaintiff,                    :

  v.                                    :      Case No. 2:14-cv-561

                                :      JUDGE GEORGE C. SMITH
Commissioner of Social Security,        Magistrate Judge Kemp
                                :
      Defendant.

REPORT AND RECOMMENDATION

I. <u>Introduction</u>

Plaintiff, Michael Hanson, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. Those applications were filed on December 7, 2010, and alleged that Plaintiff became disabled on July 21, 2010.

After initial administrative denials of his claim, Plaintiff was given a hearing before an Administrative Law Judge on January 31, 2013. In a decision dated February 8, 2013, the ALJ denied benefits. That became the Commissioner's final decision on April 18, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on August 21, 2014. Plaintiff filed his statement of specific errors on October 11, 2014, to which the Commissioner responded on January 13, 2015. Plaintiff filed a reply on January 27, 2015, and the case is now ready to decide.

II. <u>Plaintiff's Testimony at the Administrative Hearing</u>

Plaintiff, who was 50 years old at the time of the administrative hearing and who attended school into the tenth grade year, testified as follows. His testimony appears at pages

50-63 of the administrative record.

Plaintiff had post-high school training in the area of truck driving, and he drove a truck for about a year. He lived in a house that had steps and he used the steps every day, but with difficulty. He last worked in 2010 loading trucks both manually and using a forklift. He had previously done construction work. He stopped working due to being jailed for a probation violation.

In 2009, Plaintiff had neck surgery which involved replacing some discs with hardware. He had cramping and numbness in his hands as well as muscle spasms in his arms. He was also prone to severe headaches. He had to lie down several times a day to deal with the pain. He also suffered a knee injury at work and had arthritis in his knee.

Plaintiff was asked about psychological issues. He testified to depression on a daily basis. He was unable to sleep for any length of time. His daily routine included watching television and staying in the upstairs of his home except to use the bathroom, which was located on the lower level. He had little social contact. His concentration was poor. He had always been interested in computers and was trying to learn how to create web pages. He was unable to walk through a grocery store without leaning on a cart and had difficulty standing in line. Plaintiff made an effort to walk three to six blocks a day, but walking affected his lower back and legs. He could lift and carry a gallon of milk.

### III. The Medical Records

The medical records in this case are found beginning on page 310 of the administrative record. The pertinent records - those relating to Plaintiff's statement of errors - can be summarized as follows.

In May, 2009, an MRI of Plaintiff's cervical spine showed disc space narrowing from C4 through C7 as well as degenerative

disease and spinal stenosis. Plaintiff was complaining of numbness in his left arm and muscle spasm in his right. He underwent surgery in October, 2009 for the implantation of a fusion plate. A state agency reviewer, Dr. Thomas, who reviewed the surgical and other records, limited him to light work but restricted him from overhead reaching. (Tr. 397-404). After surgery, Plaintiff reported the elimination of his arm pain but continuation of chronic neck pain, as well as an increase in back pain. An MRI of the lumbar spine was recommended as part of an effort to get him back to work. (Tr. 405). His surgeon, Dr. Shannon, had previously anticipated that Plaintiff would be released to work after February, 2010. (Tr. 408). He did return to work in the Spring of 2010.

Keli Yee, a psychologist, completed a functional capacity assessment form on March 24, 2011. She thought Plaintiff had a number of marked limitations, particularly in the areas of maintaining attention and concentration, dealing with work stress, and dealing with the public. She also completed a narrative report based on an in-person interview. Plaintiff described his daily activities as doing some housework and cooking. He appeared to be moderately disengaged and reported depression as well as increased suicidal ideation. He also reported decreased concentration and some memory problems. His WRAT test scores exceeded the 12th grade level. Dr. Yee thought he would benefit from referral to a psychiatrist and from psychotherapy. She said that with mood stability he would be a good candidate for vocational rehabilitation. She rated his GAF at 60. (Tr. 581-89).

Dr. Dunmyer completed a physical capacity evaluation form on March 30, 2011. She concluded that, based on her examination of Plaintiff and on his reports of symptoms and activities, he was markedly or extremely limited in pushing and pulling, bending,

-3-

and reaching, that he could lift only five pounds, and that, in total, he could stand, walk, and sit for only five hours in a workday. (Tr. 590-91).

Floyd Sours, a consulting psychologist, also did a consultative examination of Plaintiff. In his report, dated September 21, 2011, he stated that Plaintiff reported no alcohol or drug problems but did disclose a number of DUI arrests and the fact that he had been in an outpatient drug program in 2010. Plaintiff said he suffered from anxiety and depression as well as neck and back problems and a bad right knee, plus arthritic pain throughout his body. His symptoms included withdrawal, poor concentration, lack of interest, fatigue, and irritability. He also had experienced anxiety attacks with shortness of breath, dizziness, nausea, and rapid heartbeat. Plaintiff's activities of daily living included letting his dog out, using a computer, doing some household chores, walking, and napping. Mr. Sours diagnosed major depression and adjustment disorder with anxiety, and rated Plaintiff's GAF at 61, although he commented that Plaintiff seemed "to be functioning pretty well interpersonally ...." He thought Plaintiff could understand, remember, and carry out instructions in a work setting, that he had mild limitations in the areas of attention and concentration, persistence, and pace, that he could behave appropriately in the work setting, and that he had "some ability to maintain appropriate behavior under work pressure." (Tr. 592-96).

Plaintiff sought treatment from Six County, Inc., in 2012 after an incident in which he stabbed himself in the arm. At that time, his GAF was rated at 50 based on suicidal ideation. He was subsequently prescribed an antidepressant. At his last visit, in January, 2013, he said the antidepressant had helped somewhat. His treating psychiatrist, Dr. Gainor, put in her notes that she did not think he could work at that time and that

she would be happy to complete a disability form for him.  (Tr. 749).

In addition to the medical records, the file contains decisions made by the Bureau of Developmental Disabilities.  The decision as to Plaintiff's physical capacity, made by Dr. Hughes, (Tr. 113-15) concluded that Plaintiff could do light work but had limitations on his ability to push and pull with his upper extremities and in climbing ladders, ropes, and scaffolds, and in stooping, kneeling, crouching, and crawling.  His overhead reaching was also limited.  The decision as to his mental capacity, made by Dr. Finnerty, stated that Plaintiff had moderate limitations in his ability to deal with detailed instructions, to maintain attention and concentration for extended periods, and to deal with work stress, but that he could perform activities requiring concentration and attention in a setting without fast pace.  (Tr. 115-16).

## IV.  The Vocational Testimony

George W. Coleman III was the vocational expert in this case.  His testimony begins on page 63 of the administrative record.

Mr. Coleman first testified about Plaintiff's past employment as working for a door manufacturer, operating a forklift, and being a construction laborer. That work ranged from semiskilled to unskilled, and from medium to very heavy.

Mr. Coleman was then asked some questions about a hypothetical person who could work at the light exertional level, but with no overhead reaching and only occasional climbing of ladders, ropes, and scaffolds, and only occasional stooping, crouching, kneeling, and crawling.  The person could also understand, remember, and carry out simple tasks and instructions, could maintain attention and concentration for two-hour segments over an eight-hour work period, could respond

appropriately to coworkers and supervisors, and could adapt to simple changes and avoid hazards in a work setting without strict production standards.  Mr. Coleman testified that a person with these limitations could not do any of Plaintiff's past work, but he or she could work as a storage facility clerk, parking lot attendant, or routing clerk.  He also indicated how many such jobs existed in regional and national economies.

A second hypothetical question was then asked by Plaintiff's counsel.  It described a person who worked for two hours, then took a fifteen minute break, then worked for two more hours until the lunch break, and did the same in the afternoon.  Mr. Coleman said that such a person would not, in his view, have any limitations on his capacity to maintain attention and concentration.

V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision is found at pages 13-29 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2013.  Next, he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 21, 2010.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including degenerative disc disease of the cervical spine status post cervical diskectomy, interbody fusion and plating at the C4-5, C5-6,and C6-7 levels, knees status post-surgical correction, depression, and anxiety.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process,

-6-

the ALJ found that Plaintiff had the residual functional capacity
to perform work at the light exertional level but that he was
precluded from overhead reaching.  He could only occasionally
climb ladders, ropes, and scaffolds, and only occasionally stoop,
crouch, kneel, and crawl.  Additionally, he was limited to the
performance of simple, routine, and repetitive tasks, he could
maintain attention and concentration for two-hour segments over
an eight-hour workday, he could respond appropriately to
supervisors and coworkers, he could adapt to simple changes in
the work, and he could avoid work hazards, all in a setting
without strict production standards.  The ALJ found that with
these restrictions, Plaintiff could not perform his past relevant
work, but he could do the jobs identified by the vocational
expert, including storage facility clerk, parking lot attendant,
and routing clerk.  The ALJ also determined that these jobs
existed in significant numbers in the national and regional
economies.  Consequently, the ALJ concluded that Plaintiff was
not entitled to benefits.

     VI.  <u>Plaintiff's Statement of Specific Errors</u>

    In his statement of specific errors, Plaintiff raises these
issues: (1) The ALJ's decision to give great weight to the
opinion of Mr. Sours was inconsistent with the residual
functional capacity finding which he made; (2) the ALJ did not
properly evaluate the medical opinion evidence, especially the
opinion of Dr. Dunmyer; and (3) the ALJ did not properly evaluate
Plaintiff's credibility.  Those issues are evaluated under the
following legal standard.

    <u>Standard of Review.</u>  Under the provisions of 42 U.S.C.
Section 405(g), "[t]he findings of the Secretary [now the
Commissioner] as to any fact, if supported by substantial
evidence, shall be conclusive. . . ."  Substantial evidence is
"'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion'" Richardson v. Perales, 402
U.S. 389, 401 (1971) (quoting Consolidated Edison Company v.
NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere
scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th
Cir. 1976).  The Commissioner's findings of fact must be based
upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435
(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th
Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir.
1984).  In determining whether the Commissioner's decision is
supported by substantial evidence, the Court must "'take into
account whatever in the record fairly detracts from its weight.'"
Beavers v. Secretary of Health, Education and Welfare, 577 F.2d
383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB,
340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human
Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court
would reach contrary conclusions of fact, the Commissioner's
decision must be affirmed so long as that determination is
supported by substantial evidence.  Kinsella v. Schweiker, 708
F.2d 1058, 1059 (6th Cir. 1983).

    A.  Mental Residual Functional Capacity

As described above, Mr. Sours stated that Plaintiff could
function in a work setting with some limitations.  The ALJ
assigned great weight to this opinion, noting that it was
generally consistent with the objective evidence and with
Plaintiff's activities of daily living and was not contradicted
by any treating source opinion.  (Tr. 22).  The ALJ also,
however, accepted and adopted the opinion of Dr. Finnerty, noting
that any evidence presented after that opinion was rendered "did
not provide any credible or objectively supported new and
material information that would alter the State agency's
findings." (Tr. 21).

Plaintiff argues that there is a fatal inconsistency between

-8-

the ALJ's decision about Mr. Sours' evaluation and the ALJ's residual functional capacity finding. Specifically, he points out that Mr. Sours (as well as Dr. Finnerty) opined that Plaintiff had some limitations in the area of concentration and attention, but that the limitation imposed by the ALJ - an ability to maintain attention and concentration for two-hour segments of the workday - is not, as Mr. Coleman, the vocational expert testified, any limitation at all. Since the hypothetical question actually contained no limitation on the ability to attend and concentrate, Plaintiff argues that a remand is needed so that a more accurate hypothetical question can be posed. The Commissioner's sole response to this argument is that the other psychological limitations imposed by the ALJ - the performance of only simple tasks, the ability to adapt to simple changes in the work setting, no strict production quotas, and the ability to cope with work hazards - completely accounted for any deficiencies in concentration and attention which might otherwise have affected Plaintiff's ability to work.

Plaintiff's argument is somewhat difficult to reconcile with the Court of Appeals' decision in <u>Ealy v. Comm'r of Social Security</u>, 594 F.3d 504 (6th Cir. 2010). There, the Court of Appeals acknowledged that limiting a claimant to simple repetitive tasks and instructions was responsive to an impairment in the ability to concentrate, finding that a further limitation to maintaining attention in two-hour segments and working without a fast pace were "speed- and pace-based restrictions." <u>Id</u>. at 516. Here, the ALJ also limited Plaintiff to work which involved only simple changes, recognizing that frequent or complex changes in the work environment would challenge someone who had difficulty maintaining attention and concentration. Consequently, it is simply not accurate to say that there is a clear variance between the limitations described in Dr. Finnerty's and Mr. Sours' findings and the restrictions which

-9-

were incorporated into the ALJ's residual functional capacity finding (and the hypothetical question posed to Mr. Coleman).

In his reply, Plaintiff relies on several decisions from the Eastern District of Michigan, which, he says, hold that limiting a claimant to simple, repetitive work does not address deficiencies in concentration, persistence, and pace.  In Benton v. Comm'r of Social Security, 511 F.Supp.2d 842 (E.D. Mich. 2007), the court found inadequate a hypothetical question which limited the claimant to simple, repetitive work when the claimant had moderate deficiencies in her ability to maintain concentration, persistence, and pace, but did so because no speed- or pace-based restrictions, such as an inability to meet quotas, were included in the question.  Here, by contrast, that limitation (no strict production standards) was part of the ALJ's residual functional capacity finding.  Similarly, the question found deficient in Bielat v. Comm'r of Social Security, 267 F.Supp.2d 698 (E.D. Mich. 2003), included a limitation to unskilled, low-stress jobs, which, again, did not address pace, nor did it reflect the fact that the claimant in that case "often" suffered from deficiencies in concentration, persistence, and pace.  Those factors are not present here.  Consequently, the Court finds no merit in Plaintiff's first statement of error.

B.  Weighing the Opinion Evidence

In his second statement of error, Plaintiff argues that the ALJ committed procedural errors in his evaluation of the opinion evidence.  More particularly, he contends that the ALJ erred by crediting the opinions of the state agency reviewers over that of Dr. Dunmyer, who examined (but did not treat) Plaintiff, and that the ALJ did not cite to any medical reports or descriptions of Plaintiff's activities of daily living which conflicted with her assessment.  He characterizes the reasons given for rejecting Dr. Dunmyer's opinions as "unsubstantiated boilerplate," Statement of Errors, Doc. 13, at 13, and asks that the case be remanded for a

proper consideration of her views.

The ALJ said that he could not "grant any great weight" to Dr. Dunmyer's opinions. (Tr. 21). He did give it some weight, but concluded that it was not "fully" supported by and was inconsistent with the greater weight of the medical evidence, which he did not think Dr. Dunmyer had reviewed. He also pointed out that Dr. Dunmyer was not a treating source and that she depended heavily on Plaintiff's own reporting of symptoms and limitations, but the ALJ found that Plaintiff was not the most reliable reporter. Finally, the ALJ said that the limitations in Dr. Dunmyer's report were not consistent with Plaintiff's activities of daily living, although he did not say exactly why he reached that conclusion. By contrast, the ALJ accepted and adopted one of the state agency reviews, noting that it was consistent with the totality of the evidence "as discussed more fully below." (Tr. 20). Beginning on page 23 of the record, the ALJ reviewed the physical findings extensively, noting that most physical examinations did not include significant objective findings, and that tests such as range of motion tests or tests for neurological deficits or nerve root compromise were normal. Additionally, imaging studies showed no significant pathology, and post-surgical treatment consisted largely of pain medications. Finally, the ALJ pointed to evidence that Plaintiff was still able to take care of basic hygiene, did light household chores, used a computer, did laundry, drove short distances, shopped, paid bills, and managed his own finances.

Plaintiff is correct that although an ALJ need not give good reasons for rejecting the opinions of non-treating medical sources, the ALJ must still apply the factors relating to medical opinions set out in 20 C.F.R. §404.1527(c) and the record must contain substantial evidence to support the ALJ's weighing of all of the medical evidence. See, e.g. Hall v. Comm'r of Social Security, 2014 WL 428579, *6 (S.D. Ohio Feb. 4, 2014), adopted

-11-

and affirmed 2014 WL 980399 (S.D. Ohio March 12, 2014)
("opinions of record-reviewing physicians are to be weighed under
the same factors as treating physicians").  He is not correct,
however, that the ALJ's reasoning was mere boilerplate or that
the evidence does not support the ALJ's weighing of the opinion
evidence.

Dr. Dunmyer explicitly noted that Plaintiff's self-report of
symptoms and limitations played a part in her analysis of his
physical restrictions.  That is a proper basis for discounting
her views.  Further, the record does not, as the ALJ correctly
noted, contain any significant amount of evidence showing serious
physical limitations, or showing any aggressive treatment.  The
most significant limitations Dr. Dunmyer proposed, relating to
standing, walking, and sitting, do not appear to be tied to any
specific physical conditions, especially Plaintiff's cervical
stenosis and fusion, which was the condition resulting in the
most treatment.  The surgeon who performed that surgery
eventually released Plaintiff to go back to work, and he did so,
losing his job (which was performed at least at the medium
exertional level, according to the vocational expert) only when
he was arrested.  The treatment records simply do not support
Plaintiff's claim (or Dr. Dunmyer's conclusion) that his
condition, either his neck or back, deteriorated afterwards to
the point where he could no longer do even sedentary work.  There
is nothing to suggest that the state agency reviewers did not
accurately interpret the records when they expressed the view
that Plaintiff could do a limited range of light work.  While his
daily activities are not the equivalent of light work, they do
show a capacity greater than Dr. Dunmyer reflected in her report.
The ALJ did not, therefore, commit any procedural error when
weighing the various opinions about Plaintiff's physical residual
functional capacity.

C.  Credibility

-12-

Plaintiff's last claim is that the ALJ did not properly evaluate his credibility.  After reciting his testimony at the administrative hearing regarding his casual activity with computers and programming, Plaintiff highlights the ALJ's statement that he broke down and reassembled computers as a hobby as evidence that the ALJ misinterpreted or mischaracterized the record.  According to Plaintiff, this misapprehension was the primary source of the ALJ's skepticism about Plaintiff's credibility and undermines his overall credibility finding.  In his reply, he characterizes the Commissioner's reference to other parts of the record supporting the ALJ's credibility determination as "generic makeweights."  Reply Memorandum, Doc. 19, at 5.

The ALJ explained his credibility determination in this way.  He noted that Plaintiff performed a wide range of daily activities, only one of which was "breaking down and rebuilding computers." (Tr. 26).  He compared some of those activities with the abilities needed to maintain employment.  He noted that Plaintiff's use of medications was not consistent with disabling mental or physical impairments, especially because there were periods of time when Plaintiff took no medication at all, and that there were other reasons why Plaintiff might not be working, such as his legal history, which also reflected poorly on his overall credibility.  Id.  The Commissioner contends that the statement about breaking down and rebuilding computers is actually supported by the record, and even if that were not so, the other reasons given by the ALJ support his decision about Plaintiff's credibility.

The law in this area is well-established.  A social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking.  Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and

intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors.  20 C.F.R. §404.1529(c)(3). Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record.  See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ cited various factors which appear in §404.1529(c), including the type of symptoms indicated by the medical records, the type of treatment Plaintiff received, and the extent of his daily activities.  That the Court might have weighed these factors differently is not a reason to reverse the ALJ.  As this Court recently observed in Kaplun v. Comm'r of Social Security, 2015 WL 736475, *7 (S.D. Ohio Feb. 20, 2015),

> It is important to keep in mind that "[i]t is ... for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."  Rogers v. Comm'r of Social Security, 486 F.3d 234, 247 (6th Cir. 2007).  A claimant may "ask[] the Court to reweigh the evidence, give her the benefit of the doubt to the extent that these facts may weigh in her favor and then advance a different view;" but that would not be proper because "the Court is charged with determining the sufficiency of the evidence, not its weight."  Thomas v. Comm'r of Social Security, 2014 WL 2114567, *16 (N.D. Ohio May 20, 2014).  Courts agree that "an ALJ may give less weight to the testimony of interested witnesses," see Obuch v. Hluchaniuk, 2009 WL 877697, *18 (E.D. Mich. March 30, 2009), and the claimant is an interested witness (that is, someone with a stake in the outcome of the case).  Further, this Court has recognized that "relative lack of treatment and few objective or clinical records ... [may] undermine [a] Plaintiff's credibility ...."  Eversole v. Comm'r of Social Security, 2013 WL 2948328, *11 (S.D. Ohio June 14, 2013), adopted and affirmed 2013 WL 3965289 (S.D. Ohio July 31, 2013).

-14-

Given this high level of deference, the Court is not persuaded that the ALJ erred in his credibility determination.  Even if he overstated some of the reasons given, his rationale, taken as a whole, touches on enough factors and has enough support in the evidence to preclude this Court from overturning that finding. There is therefore no merit in Plaintiff's final claim of error.

## VII.   Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant.

## VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge